**THIRD DIVISION**
**MILLER, P. J.,**
**RAY and BRANCH, JJ.**

NOTICE: Motions for reconsideration must be
*physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.
(Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)
http://www.gaappeals.us/rules/

**March 26, 2013**

# In the Court of Appeals of Georgia

A12A2268. COOK et al. v. BOTTESCH.

A12A2269. COOK et al. v. SHOREY.

A12A2506. GLOVER v. COOK et al.

A13A0006. COOK et al. v. ROBERTSON.

BRANCH, Judge.

These cases require us to determine whether Georgia has properly implemented a certain asset transfer penalty dictated by the federal Medicaid statute in connection with coverage for long-term care. The difficulty is that there appear to be conflicting provisions of the statute pertaining to the penalty, specifically, the circumstances under which the penalty applies to annuities purchased by the Medicaid applicant or his or her spouse. One provision imposes a penalty on couples who, in a five-year, look-back period, purchase an annuity without naming the State as a remainder beneficiary. The other provision excludes certain annuities from the asset transfer

penalty. In the four cases before us, the Georgia Department of Community Health (DCH) imposed an asset transfer penalty on the applicants for Medicaid benefits because either they or their spouses refused to name the State as the remainder beneficiary on an annuity. For the reasons explained herein, we rule in favor of DCH on three cases but against DCH on one case with distinguishing facts. [1]

The parties do not dispute the essential facts found by the superior courts. John Bottesch, Carol Shorey, Boyce Robertson, and Jerry Glover (the "applicants") are elderly persons who reside, or did reside before death[2], in nursing homes and who sought Medicaid benefits for that care. Near in time to Bottesch, Shorey, and Robertson applying for Medicaid benefits, their respective spouses purchased one or more irrevocable, non-assignable, and actuarially sound annuities, which provide monthly benefits to the "community spouse" (i.e., not the institutionalized spouse). Glover purchased such an annuity for himself.

In connection with processing the applicants' Medicaid benefits applications, DCH asked the purchasers of the annuities to verify that they had named the State of

---

[1] Given the similarity of the underlying facts and the controlling legal issues, we have consolidated these cases for the purpose of appeal.

[2] Carol Shorey died in January 2011.

Georgia as the remainder beneficiary as required by § 2339 of DCH's Economic Support Services Manual (the "State Medicaid Manual"). The purchasers refused and claimed that § 2339 was inapplicable and in contravention of other provisions of federal law. In each case, DCH approved the applications for benefits but also imposed a multi-month penalty in light of the purchasers' refusal. The penalty had an adverse effect on the applicants by precluding benefit payments to the nursing homes during the penalty period. The applicants thereafter sought a hearing and review before the Office of State Administrative Hearings (OSAH).

With regard to Bottesch, Shorey, and Robertson, OSAH determined that the penalty was inapplicable but that the applicants were not eligible for Medicaid benefits until they submitted a statement that they had designated the State as a remainder beneficiary. After an unsuccessful attempt at additional agency review,[3] Bottesch and Shorey petitioned for review in the Superior Court of Union County; Robertson petitioned for review in the Superior Court of Towns County. The same judge from the Enotoh Judicial Circuit was assigned to all three cases. On March 29, 2012, that judge signed orders in all three cases reversing the administrative rulings.

_____

[3] Bottesch and Shorey sought review of the OSAH decision by the Appeals Reviewer for DCH. The Appeals Reviewer effectively reinstituted DCH's original decision, including the penalty.

3

The judge held that the State Medicaid Manual's § 2339 requirement that the community spouse name the State as a remainder beneficiary violates federal Medicaid law, both because the annuities were not "assets" for purposes of imposing a transfer of assets penalty and because the § 2339 requirement contravened separate spousal impoverishment protection provisions of the Medicaid statute. In May 2012, this Court granted DCH's applications for discretionary review in each of these three cases.

With regard to Glover, OSAH reversed the penalty and concluded that § 2339 of the State Medicaid Manual violated federal law because the annuity did not fall within the definition of an asset for purposes of imposing the penalty. DCH sought review by the Appeals Reviewer, which reinstituted DCH's decision; this final decision held that Glover was subject to the penalty. Glover petitioned for review in the Superior Court of Hall County. On May 7, 2012, the superior court affirmed the final agency decision. We granted Glover's application for discretionary review.

Thus the Bottesch, Shorey, and Robertson cases require us to determine whether the Department correctly assessed the asset transfer penalty on annuities purchased with marital assets for the benefit of the community spouse, whereas the Glover case requires us to answer the same question for an annuity purchased for the

benefit of the institutionalized spouse. In all four cases, however, DCH's final decision held that the applicants were eligible for medical assistance but that they were subject to the asset transfer penalty because they failed to name the State as a remainder beneficiary.

1. "Judicial review of an administrative decision requires the court to determine that the findings of fact are supported by 'any evidence' and to examine the soundness of the conclusions of law that are based upon the findings of fact. OCGA § 50–13–19 (h)." *Pruitt Corp. v. Ga. Dept. of Community Health*, 284 Ga. 158, 160 (3) (664 SE2d 223) (2008). This scope of judicial review is narrow, and in a case where the facts are not in dispute, such as here, the court

> may reverse or modify the agency decision if substantial rights of the appellant have been prejudiced because the administrative decision is: (1) in violation of constitutional or statutory provisions; (2) in excess of the statutory authority of the agency; (3) made upon unlawful procedure; (4) affected by other error of law. OCGA § 50–13–19 (h).

(Punctuation omitted.) Id. at 161 (3); see also *Ga. Dept. of Community Health v. Medders*, 292 Ga. App. 439, 440 (664 SE2d 832) (2008). The primary issue in this case is whether § 2339 of DCH's Medicaid Manual is in violation of the Medicaid statute. Thus, we begin by interpreting that statute.

5

2. When construing a federal statute, "the starting point must be the language employed by Congress, and courts must assume that the legislative purpose is expressed by the ordinary meaning of the words used." (Punctuation omitted.) *A Fast Sign Co. v. American Home Svcs.*, 291 Ga. 844, 846 (734 SE2d 31) (2012), quoting *American Tobacco Co. v. Patterson*, 456 U. S. 63, 68 (II) (102 SC 1534, 71 LE2d 748) (1982). And "judicial construction is necessary only when a statute is ambiguous; in fact, when the language of a statute is plain and unequivocal, judicial construction is not only unnecessary but forbidden." (Citation omitted.) *Fleming v. State*, 271 Ga. 587, 589 (523 SE2d 315) (1999).

(a) The Plain Language of the Statutory Asset Transfer Penalty. Federal law requires that a state plan for medical assistance comply with the provisions of 42 USC § 1396p with respect to transfers of assets. 42 USC 1396a (a) (18). Subsection 1396p (c) requires that the state plan provide a penalty for disposal of assets for less than fair market value during a five-year, look-back period:

> if an institutionalized individual or the spouse of such an individual . . . disposes of assets for less than fair market value on or after the look-back date . . . , the individual is ineligible for medical assistance for [inter alia, nursing facility services] . . . during the period beginning on the [lookback] date [for a period of time related to the uncompensated value of assets transferred on or after the look-back date].

6

The remainder of subsection (c), including the provisions relevant here, provides additional rules regarding the assessment of penalties for transfers of various types of assets, as well as rules protecting certain transfers from the penalty.

Subsection (c) (1) (F) contains the requirement that the purchase of an annuity will be treated as the disposal of an asset for less than fair market value unless the State is named as a remainder beneficiary:

> (F) For purposes of this paragraph, the purchase of an annuity shall be treated as the disposal of an asset for less than fair market value unless – (i) the State is named as the remainder beneficiary in the first position for at least the total amount of medical assistance paid on behalf of the institutionalized individual under this subchapter; or (ii) the State is named as such a beneficiary in the second position after the community spouse or minor or disabled child and is named in the first position if such spouse or a representative of such child disposes of any such remainder for less than fair market value.

42 USC § 1396p (c) (1) (F). Standing alone, the plain language of subsection (c) (1) (F) is unrestricted; it applies to the "purchase of an annuity." Thus, under a plain reading of this subsection, unless the State is named as the remainder beneficiary as provided, the purchase of any annuity during the look-back period is automatically

considered the disposal of an asset for less than fair market value, thereby triggering the asset transfer penalty.

The relevant portion of subsection (c) (1) (G), however, states that although in general the purchase of annuities are considered transfers of assets subject to the penalty, the purchase of certain defined annuities are not considered transfers of assets subject to the penalty:

> (G) For purposes of this paragraph with respect to a transfer of assets, the term "assets" includes an annuity purchased by or on behalf of an annuitant who has applied for medical assistance with respect to nursing facility services or other long-term care services under this subchapter unless – (i) . . .[4]; or (ii) the annuity is irrevocable and nonassignable; is actuarially sound . . .; and provides for payments in equal amounts during the term of the annuity, with no deferral and no balloon payments made.

42 USC § 1396p (c) (1) (G).

We first find that the plain language of subsection (c) (1) (G) shows that it pertains only to annuities purchased "by or on behalf of an annuitant who has applied

---

[4] Subsection (c) (1) (G) (i) shelters certain annuities defined under the Internal Revenue Code, as well as annuities purchased with the proceeds of IRAs, simplified employee pensions, and Roth IRAs; but the annuities at issue in this opinion do not fall into these categories.

for medical assistance." An "annuitant" is the beneficiary of an annuity. Black's Law Dictionary (9th ed. 2009). The annuitant relevant to subsection (c) (1) (G), therefore, is the Medicaid applicant, i.e., the institutionalized spouse. Thus annuities naming the community spouse as the beneficiary are considered assets with respect to transfers of assets under § 1396p (c), and therefore they are not protected from the penalty even if they are irrevocable, non-assignable, and actuarially sound. Accordingly, only annuities benefitting the institutionalized spouse are protected from the penalty under subsection (c) (1) (G). Glover's annuity falls under this protection.

Second, the language of subsection (c) (1) (G) protects qualifying annuities benefitting the institutionalized spouse by removing them altogether from the definition of "assets" with respect to a "transfer of assets" under "this paragraph." 42 USC § 1396p (c) (1) (G). Rereading subsection (c) (1) (F) in light of the plain meaning of subsection (c) (1) (G) shows that annuities protected from the asset-transfer penalty by subsection (c) (1) (G) can never be treated as the disposal of an asset for less than fair-market value because they cannot be considered "assets" for the purpose of a transfer of assets in the first place. Thus, compliance with subsection

9

(c) (1) (G) operates to exempt complying annuities from the requirement of having to name the State as a remainder beneficiary under subsection (c) (1) (F).[5]

Finally, subsection (e) (1)[6] requires the couple to disclose "any interest the individual or community spouse has in an annuity. . ., *regardless of whether the annuity is irrevocable or is treated as an asset*." (Emphasis supplied.) 42 USC § 1396p (e) (1). This provision supports our reading of subsection (c) (1) (F) and (G): it makes clear that couples must disclose both (i) annuities that are irrevocable, i.e.,

---

[5] Glover points out that DCH did not ask him to name the State as a remainder beneficiary on annuities that he owns that fall under subsection (c) (1) (G) (i) (addressing certain retirement related annuities).

[6] The full text of subsection 42 USC § 1396p (e) (1) provides:
In order to meet the requirements of this section for purposes of section 1396a(a)(18) of this title, a State shall require, as a condition for the provision of medical assistance for services described in subsection (c) (1) (C) (i) of this section (relating to long-term care services) for an individual, the application of the individual for such assistance (including any recertification of eligibility for such assistance) shall disclose a description of any interest the individual or community spouse has in an annuity (or similar financial instrument, as may be specified by the Secretary), regardless of whether the annuity is irrevocable or is treated as an asset. Such application or recertification form shall include a statement that under paragraph (2) the State becomes a remainder beneficiary under such an annuity or similar financial instrument by virtue of the provision of such medical assistance.

10

those annuities benefitting the institutionalized spouse that conform with subsection (c) (1) (G), and (ii) annuities that are treated as assets for the purpose of the asset-transfer penalty, i.e., all annuities benefitting the community spouse plus those annuities benefitting the institutionalized spouse *that fail to conform* with subsection (c) (1) (G).

Furthermore, subsection (e) (1) goes on to provide that the Medicaid application must include "a statement that under paragraph (2) the State becomes a remainder beneficiary under such an annuity or similar financial instrument by virtue of the provision of such medical assistance." Id. And the referenced "paragraph 2" of subsection (e) implicitly distinguishes between annuities that are subject to subsection (c) (1) (F)'s requirement (of naming the State as the remainder beneficiary) from those that are not:

> In the case of disclosure concerning an annuity under subsection (c) (1) (F) of this section, the State shall notify the issuer of the annuity of the right of the State under such subsection as a preferred remainder beneficiary in the annuity for medical assistance furnished to the individual.

42 USC § 1396p (e) (2) (A). Thus, subsection (e) buttresses the conclusion that subsection (c) (1) (F) does not apply to all annuities, regardless of form.

11

In sum, a plain reading of subsections (c) (1) (F) and (G) shows that annuities benefitting community spouses must name the State as a remainder beneficiary to avoid automatically being treated as the disposal of an asset for less than fair market value, but annuities benefitting applicant institutionalized spouses that conform with the requirements of subsection (c) (1) (G) (ii) need not do so.

(b) We note that the relevant administrative agency interpretation of the Medicaid statute is partly inconsistent with our reading of the plain language. The Centers for Medicare & Medicaid Services (CMS), a division of the Department of Health and Human Services, is the federal agency in charge of administering Medicaid.[7] Consistent with our reading, CMS first interprets (c) (1) (F) to apply to annuities purchased by either spouse, and it interprets (c) (1) (G) to apply only when the institutionalized spouse is the annuitant:

> Unlike the new section [ ](c) (1) (G) . . . section [ ] (c) (1) (F) does not restrict application of its requirements only to an annuity purchased by or on behalf of an annuitant who has applied for medical assistance for nursing facility or other long term-care services. Therefore, we interpret

---

[7] See *Douglas v. Indep. Living Ctr. of S. Cal.*, _ U. S. _ (132 SC 1204, 1207, 182 LE2d 101) (2012); 42 USC § 1396 (a). See also 42 USCA § 1396p (e) (3) ("The Secretary may provide guidance to States on categories of transactions that may be treated as a transfer of asset for less than fair market value.").

> section [ ] (c) (1) (F) as applying to annuities purchased by an applicant or by a spouse, or to transactions made by the applicant or spouse. . . .

> Unlike the new section [ ] (c) (1) (F) discussed above, [new section (c) (1) (G)] does not apply to annuities for which the community spouse is the annuitant.

See Centers for Medicare & Medicaid Servs., § 6012, Changes in Medicaid Annuity Rules Under the Deficit Reduction Act of 2005, pt. (II) (B) and (C) (2006). But inconsistent with our reading, CMS then interprets the two subsections in a manner it argues that both can apply:

> [The] requirement [provided by subsection (c) (1) (G)] is in addition to those specified in [ ] (c) (1) (F) pertaining to the State's position as a remainder beneficiary.

Id. at pt. (II) (C). Thus, under the CMS interpretation of the relevant statutes, even annuities that conform with subsection (c) (1) (G) requirements must meet subsection (c) (1) (F) requirements in order to be protected from the asset transfer penalty.

We recognize that "judicial deference is to be afforded [the agency's] interpretation . . . of statutes it is charged with enforcing or administering and the agency's interpretation of rules and regulations it has enacted to fulfill the function given it by the legislative branch." *Pruitt Corp.*, supra at 159 (2) (citation omitted).

13

See also *Chevron U.S.A. v. Natural Resources Defense Council*, 467 U. S. 837, 844 (II) (104 SC 2778, 81 LE2d 694) (1984) ("a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency") (footnote omitted). Nevertheless, an agency interpretation cannot contravene the plain meaning of the words chosen by the legislature when those words are not ambiguous:

> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.

*Chevron*, 467 U. S. at 842-843 (III); Cf. *Christensen v. Harris County*, 529 U. S. 576, 588 (120 SC 1655, 146 LEd2d 621) (2000) (where language is not ambiguous deference to agency interpretation is unwarranted). We find that that portion of CMS's interpretation that provides that an annuitant applicant must comply with both subsections (c)(1)(G) and (F) to avoid the asset transfer penalty contravenes the plain meaning of the statutory language and, therefore, is not entitled to deference.

14

(c) The Spousal Protection Provisions of the Medicaid Statute. Bottesch, Shorey, and Robertson contend that our interpretation of (c) (1) (F) and (G) is superseded by the combined impact of three "spousal protection" provisions of the Medicaid statute pursuant to which (i) a community spouse may retain the CSRA[8] (see 42 USC § 1396r-5 (c) (2) and (f) (2)); (ii) unlimited transfers are allowed between spouses (see 42 U S C § 1396r-5 (c) (4) and 42 USC § 1396p (c) (2) (B) (i)); and (iii) a community spouse's income has no effect on an institutionalized spouse's Medicaid eligibility (42 USC § 1396r-5 (b) (1)). The applicants contend the combined effect of these provisions dictates that subsection (c) (1) (G) applies to the community spouse as well as the institutionalized spouse and frees them from the requirement of having to name the State as a remainder beneficiary. We disagree for several reasons.

First and foremost, as shown above, the plain language of subsection (c) (1) (G) specifically limits its application to annuities "purchased by or on behalf of an annuitant who has applied for medical assistance." 42 USC § 1396p (c) (1) (G). And although § 1396r-5 provides that it supersedes any other provision of the subchapter

---

[8] "One provision of the MCCA allows an institutionalized spouse to qualify for Medicaid assistance while reserving for the community spouse a capped amount of assets for the community spouse's benefit, known as the 'community spouse resource allowance' or 'CSRA.'" *Hutcherson v. Arizona Health Care Cost Containment System Admin.*, 667 F3d 1066, 1069 (III) (9th Cir. 2012).

15

(which would include § 1396p), the annuity provisions of § 1396p were added to the Medicaid statute more recently, specifically to address the proper handling of annuities.[9] "Specific statutes govern over more general statutes," *Glinton v. And R, Inc.*, 271 Ga. 864, 867 (524 SE2d 481) (1999) (citation omitted), and "the most recent legislative expression prevails." (Citations omitted.) *Jenkins v. State*, 265 Ga. 539, 540 (1) (458 SE2d 477) (1995).

Second, the applicants' reliance on the various spousal protection features of the Medicaid statute is a red herring because those features concern an individual's overall eligibility for Medicaid. The application of a penalty, in the form of delayed eligibility, for failure to comply with the rules regarding purchase of an annuity, is a separate question. The applicants acknowledge this distinction: "[DCH] is correct that the issue before this Court does not involve an eligibility determination, as the

---

[9] In 1988, as a part of the Medicare Catastrophic Coverage Act of 1988, Pub. L. No. 100-360 (102 Stat 683) (MCCA), Congress added the "spousal impoverishment" provisions to the Medicaid statute, which were codified at 42 USC § 1396r-5. Pub. L. No. 100-360, § 303. In 2005 (effective February 8, 2006), Congress amended the Medicaid statute as a part of the Deficit Reduction Act of 2005, Pub. L. No. 109–171 (120 Stat. 4) (DRA), and added the three subsections of § 1396p that specifically address annuities. Several cases cited by the applicants are distinguishable because they address annuities purchased before the DRA became effective or they are based on the law as it existed prior to the DRA. See, e.g., *James v. Richman*, 547 F3d 214, 215 (3rd Cir. 2008); *James v. Richman*, 465 FSupp2d 395 (MD Pa. 2006); *Mertz v. Houstoun*, 155 FSupp2d 415 (ED Pa. 2001).

16

[applicants have] been found eligible." And § 1396r-5 provides that it supersedes other provisions of the subchapter only "[i]n determining the eligibility for medical assistance of an institutionalized spouse." See 42 USC § 1396r-5 (a) (1).[10] The question of whether the annuities at issue in this case are countable resources for the purpose of determining eligibility is not before us.[11]

More specifically, none of three spousal protection features cited by the applicants has any bearing on the penalty provision in § 1396p (c), or vice-versa. First,

---

[10] The Code section goes on to provide that "Except as this section specifically provides, this section does not apply to – (A) the determination of what constitutes income or resources, or (B) the methodology and standards for determining and evaluating income and resources." 42 USC § 1396r-5 (a) (3).

[11] Many of the cases cited by the applicants are distinguishable because they address whether annuities are countable resources for the purpose of determining eligibility; and one of these cases is further distinguished because it is based on application of subsection (c) (1) (G) to annuities purchased for community spouses. See, e.g., *Lopes v. Dept. of Social Svcs.*, 696 F3d 180, 188 (2nd Cir. 2012) (issue presented was whether payment stream of annuity purchased by community spouse was a countable resource for the purposes of the institutionalized spouse's eligibility for medical assistance); *Morris v. Oklahoma Dept. of Human Svcs.*, 685 F3d 925, 938 (III) (B) (4) (10th Cir. 2012) (addressing whether an annuity benefitting the community spouse is a countable resource for the purpose of determining the institutionalized spouse's eligibility; and based on application of subsection (c) (1) (G) to community spouses); *Weatherbee v. Richman*, 595 FSupp2d 607, 616-617 (IV) (WD Pa. 2009) (determining that annuity cannot be treated as a countable resource); *Geston v. Olson*, 857 FSupp2d 863, 878 (III) (D) (ND 2012) (addressing whether annuity payments were countable resources); *Vieth v. Ohio Dept of Job & Family Svcs.*, 2009 WL 2332870 (2009) (whether funds used to purchase annuity for the sole benefit of the community spouse was a countable resource for Medicaid eligibility purposes).

17

the CSRA is a portion of the couple's countable resources that is not considered available to the institutionalized spouse for the question of eligibility. See 42 USC § 1396r-5 (c) (2) and (f) (2). A "resource" for this purpose is defined in § 1396r-5 (c) (5). See also 20 C.F.R. § 416.120 (c) (3) ("Resources means cash or other liquid assets or any real or personal property that an individual owns and could convert to cash to be used for support and maintenance"). The term "assets" for the purpose of the asset transfer penalty is defined in § 1396p (h). The definition of assets includes income, resources, and other items, and the remainder of § 1396p (c) further delineates what constitutes an asset for this purpose; in so doing, it repeatedly and explicitly begins by stating "For purposes of this paragraph with respect to a transfer of assets, the term 'assets' includes. . . ." See 42 USC § 1396p (c) (1) (G), (I), and (J). It is clear, therefore, that the definition of "resources" under § 1396r-5 (c) (5) and the definition of "assets" for the purposes of a "transfer of assets" under § 1396p (c) are not the same. Accordingly, the portions of the Medicaid statute that concern countable resources do not control our decision regarding when annuities are subject to the asset transfer penalty.

The argument that the second spousal protection feature cited by the applicants – that unlimited resources transfers are allowed between spouses – should govern our

18

decision is also without merit. See 42 USC § 1396p (c) (2) (B) (i). The applicants fail to point out that the complete wording of the Code section provides that "[a]n individual shall not be ineligible for medical assistance by reason of [the asset transfer penalty] to the extent that. . . the assets. . . were transferred to the individual's spouse or to another for the sole benefit of the individual's spouse." (Emphasis supplied.) Id. Notably, Bottesch, Shorey, and Robertson only argue that this provision should guide our decision; they do not argue that their spouses are the sole beneficiary of the relevant annuities, and they cannot because their annuities name children, trusts and others as beneficiaries.

Finally, and similarly, the fact that a community spouse's *income* has no effect on an institutionalized spouse's eligibility for Medicaid benefits, see 42 USC § 1396r-5 (b) (1), is also unrelated to assessing penalties for improper transfers of *assets*.

3. Some of the relevant provisions of Georgia's Medicaid Manual are consistent with our construction of subsections 1396p (c) (1) (F) and (G), and some are not. The Manual provides

> Effective with annuities purchased on or after 2/8/06, for [applicant/recipients] applying for or already receiving [long-term care] Medicaid, the State of Georgia must be named as the remainder beneficiary of the annuity in the first position for the total amount of

19

medical assistance paid on behalf of the individual receiving [long-term care] Medicaid.

EXCEPTION: If there is a community spouse and/or minor or disabled child(ren), the State may be named in the next position after those individuals. If that is the case and any of those individuals or their representatives dispose of any of the remainder of the annuity for less than the [fair market value], the State must then be named in the first position.

And, pursuant to the multi-step procedure for addressing annuities set forth in Section 2339 of the Georgia Manual, Step 1 requires determining whether the applicant, spouse, or representative has given full disclosure of all annuities; if they have not, Medicaid coverage is denied. Step 2 requires verification that the State has been named as the remainder beneficiary on any annuity; if so, the procedure skips Step 3 and goes to Step 4. If the answer is no, Step 3 provides that DCH proceed with assessing a transfer of assets penalty, and the analysis is concluded. Thus, Step 4, in which certain annuities are slotted for special treatment "if the annuity is one which is exempt from the transfer of assets penalty" is only reached if the State has been named as a remainder beneficiary under Step 3.

Thus, § 2339 fails to exempt annuities that comply with subsection (c) (1) (G) from the requirement of naming the State as a remainder beneficiary, and it is therefore inconsistent with the plain language of the Medicaid statute. Because DCH's Medicaid Manual as applied to Glover is in violation of federal law and Glover's substantial rights have been prejudiced by application of the asset transfer penalty, we are authorized to reverse the agency decision below, and accordingly, the judgment of the superior court. OCGA § 50–13–19 (h). See also *Medders*, supra at 440.

With regard to Bottesch, Shorey, and Robertson, we uphold the agency ruling that they are subject to the asset transfer penalty because they failed to comply with the requirement found in 42 USC § 1396p (c) (1) (F) to name the State as a remainder beneficiary of the annuities relevant to their cases on appeal. The decisions of the superior court in their cases must therefore be reversed.

*Judgments reversed in all four cases. Miller, P. J., and Ray, J., concur.*